FILED

2005 Mar-31  PM 12:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CYNTHIA SIMS, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 03-AR-1073-S |
| | } | |
| JOHN E. POTTER, POSTMASTER | } | |
| GENERAL, UNITED STATES POSTAL | } | |
| SERVICE, | } | |
| | } | |
| Defendant. | } | |

**MEMORANDUM OPINION**

Before the court is the motion for summary judgment by defendant, John E. Potter, in his capacity as Postmaster General ("Potter") of all claims in this case against him, and the United States Postal Service ("USPS"). Plaintiff, Cynthia Sims ("Sims") brought an action under Title VII for a hostile work environment because of sex and retaliation.

**Statement of Facts[1]**

Sims began work for the Federal Government in the 1970s, originally working at the Social Security Administration. After

---

[1] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir. 1993). In accordance with this standard, the following statement of facts includes both undisputed facts and the facts according to the plaintiff's evidence, where there is a dispute.

approximately eight years at the SSA, she was hired by the USPS in June of 1983. She spent the majority of her time at the USPS in Finance/Budget Department, in Birmingham, Alabama. She held the positions of Financial Analyst, Budget Analyst, Senior Budget and Financial Analyst, and finally, Manager of Budget. The Budget Manager is responsible for developing, and overseeing, the operating and capital budgets for the district. Sims held this position from January, 1997, until she left work on June 18, 2001. Sims has been married for approximately twenty years.

In 1997, and 1998, Sims claims she was denied performance bonuses given to other employees. Sims claims that Martha Harris, the acting supervisor of Finance, failed to give her a performance bonus for her detail in Dothan, while giving one to other employees. Sims has no idea why Martha Harris did not give her the bonus.[2]

While Sims was Manager of Budget, her direct supervisor was Manager of Finance, Ricardo Archbold ("Archbold"). Archbold supervised Sims for most of the period from 1997-2001.

In June 1998, Sims says that Archbold stood in the doorway of her office and leered at her while rolling his tongue at her

---

[2] Because there was no claim for these performance bonuses in the complaint, Potter's argument that they are barred for failure to exhaust was not necessary. However, it seems clear that administrative remedies were not exhausted in pursuit of any such claims. Being discrete acts, the forty-five day window ran long ago on these claims. Sims never seriously contests the analysis given by Potter in his brief, so assuming *arguendo* that this claim was somehow included in the complaint, summary judgment of a claim based on the denial of these performance bonuses is appropriate for failure to exhaust as argued in Potter's brief in support of his motion for summary judgment.

in a manner "suggestive of oral sex." Sims claims this activity happened on several occasions. On June 18, 1998, while Sims was discussing the poor performance of John Carson ("Carson") with Archbold, Archbold began shouting at Sims. Sims says that Archbold "moved into her personal space" and waved his arms around. As Sims was leaving the building that day, Archbold followed her, she says that she feared that something was going to happen. She described Archbold's conduct as "more walking behind me and yapping." Nothing further happened. Later in the summer of 1998, Archbold offered Sims a pair of concert tickets, but demanded that Sims come by his place and get the tickets. Sims refused.

In November 1998, while on assignment to USPS Headquarters in Washington, D.C., Sims received a call from Archbold asking why she denied a leave request made by Carson. Sims says he used a very demeaning tone. Later that month, while Sims was still in D.C., Archbold informed Sims that she would not be filling out her evaluations for *all* her employees[3], even though she had been their supervisor for the entire evaluation period. Archbold allowed the acting manager to perform the evaluations. Archbold claimed this was because Sims was away on detail. Archbold,

---

[3] Sims misrepresents the facts slightly in her brief. She states that she was not allowed to do "performance evaluations for her male employees." The deposition testimony cited for this, of course, states that, in fact, she did not do evaluations for all of her employees, male or female. While Sims' appears to be logically accurate, it leaves out some apparent facts. It is, however, unclear from the record, whether Sims managed any female employees.

however, evaluated Sims while she was away on detail. A year later, on November 16, 1999, even though Archbold was away, Sims was again informed that she would not be evaluating her subordinates. This time, Martha Harris informed Sims she would not be performing the evaluations. Again, Sims was away (this time in Dothan). Sims says she was never given a reason why she was not allowed to evaluate her subordinates this second time.

In the spring of 1999, the Finance and Budget Departments attended a USPS working retreat at Twin Pines Resort. The retreat required the employees to stay overnight. After the day's presentations and workshops, Sims returned to her room. At around 10:30 p.m., Archbold knocked on her door and asked her to come out and "party" with him. Sims declined the offer.

On July 29, 1999, Sims says that Archbold refused to support her attempt to discipline Carson for his performance problems. Archbold said that Carson would be better mentored by another man. Archbold counseled Carson and sought to help him improve. However, when Carson made a mistake, Archbold held Sims responsible for the mistake, because she was his supervisor. Archbold sometimes chastised or "humiliated" Sims in staff meetings regarding issues of Carson's mistakes.

At the end of July 1999, Sims accepted a temporary higher level assignment as Acting Postmaster in Dothan, Alabama. Gloria Tyson, the Alabama District Manager asked Sims to return to

Birmingham to help get the budget ready. Sims felt this was an unfair request, but did it anyway.

Likewise, in July 1999, Archbold was sent on an eighteen month detail away from the Birmingham office. He returned to the Birmingham office as Manager of Finance in January 2001. Upon his return, Sims claims that Archbold began to order her to do tasks that were routinely done by subordinate employees. Further, he monitored her telephone usage and whereabouts while at work. On May 9, 2001, Archbold asked Sims, in front of other employees, why she was not in her office. Sims responded that she was in the restroom. Archbold said that he wanted to know where she was at all times.

On June 1, 2001 Sims called in sick. Upon learning this, Archbold had his secretary call her at home to find about her condition, and to instruct her to bring in medical documentation. Sims had approximately eleven hundred hours of sick leave available to her at the time. Regardless, USPS Policy does not generally require medical documentation unless the sick leave is over three days, or there is evidence of abuse of sick leave policy. Sims never had to submit any medical documentation.

On June 4, 2001, Sims returned from her sick leave and notified Archbold that she would be filing a written complaint alleging sexual discrimination and harassment. That same day, Sims filed a written complaint with Virginia Files, the EEO

Dispute Specialist at the Main Birmingham Post Office. Sims claims that numerous times over the preceding years she had complained of Archbold's sexually discriminatory treatment of her and that no action was taken against him. Sims claims that Marsha Jackson, the Employee Workplace Intervention Analyst, told her that other women had complained about Archbold. None of those other women are named by Sims. No investigation or action was undertaken against Archbold until the June 4, 2001 formal written complaint to the EEO.

After receiving the formal written complaint, Virginia Files, the EEO specialist, refused to investigate any events which occurred more than 45 days before the letter. Files also chose not to interview any of the Postal Service officials that Sims listed as possible witnesses. Files limited her inquiry to the May 9, 2001 and June 1, 2001 incidents. Files interviewed Archbold on August 11, 2001, but did not ask him about any possible retaliation. Files report concluded that no discrimination had taken place.

On June 13, 2001, in light of Sims formal complaint, Sims and Archbold were required to attend redress mediation with Wendy Hankins, the Manager of Human Resources. At the mediation, Sims went through her side of the complaints against Archbold. Archbold was allowed to give his side of each of incidents. At the end of mediation, Archbold promised to change his behavior

towards Sims. Sims says that Archbold's behavior did not
dramatically change. On around June 18, 2001, Archbold came to
Sims office and "mocked" her complaints and made light of the
changes recommended for him. Sims describes the event this way:
Archbold's "behavior was more like mocking what had happened,
coming in, good morning, are we feeling ok today, as if giving
the indication that I'd gotten away with something." This
interaction caused Sims to "vomit at her desk" and forced her to
leave work. Sims was not able to return to work until June 2002
because of her medically diagnosed Adjustment Disorder. On July
27, 2001, Sims filed a letter with the EEO, via Virginia Files,
listing many, but not all, of the facts stated above as the basis
for a charge of race, sex and retaliatory discrimination.[4]

Upon her return to the work, Sims became the District Retail
Manager. This was a lower grade and pay scale than her previous
position. Sims voluntarily accepted her new job at the lower
grade and salary because of her limitations. After a one year
absence, she was given three positions which she was capable of
performing. She selected District Retail Manager. There was no
available position at her past grade and pay (Level 21).

The USPS allows employees to keep their salary from a prior
job if they move to a lower position with a lower salary, under
certain circumstances. "Salary Protection" is available only in

---

[4]The race claim did not make it into the complaint, most likely because
Archbold, like Sims, is black.

the situation where the employee's position was eliminated due to reduction in force, and "grade protection" was only available where there was a major restructuring of the Postal Service.   In fact, saved grade is not offered anymore at all. Sims claims she was retaliated against because she did not receive "saved salary and grade" after her one year hiatus from work due to mental illness.

## Analysis [5]

**Retaliation**

Sims claims that she was retaliated against for reporting sexual harassment to the EEO officer at the Postal Service. Sims identifies two distinct retaliatory events. First, Sims says she was subjected to retaliatory harassment by Archbold on or around June 18, 2001, shortly after a June 13, 2001 mediation with him. Second, Sims, now,  also claims that upon her return to the Postal Service, after nearly a year of medical leave, she was retaliated against because she was assigned a job with a lower pay scale than her prior job.

---

[5]The parties have argued past each other, often with no regard for what the other side has actually argued. A certain percentage of the blame for this falls on the plaintiffs' claims, and the morphing of those claims throughout the process. While Sims' complaint only includes two counts, one for hostile work environment sexual harassment and retaliation, Potter argues against every possible claim could conceivably be alleged from the facts, not settling for mere summary judgment on the actual claims. Despite this, the court only seriously looks at those two issues presented to it by the Sims' complaint. The court assumes that these are the final versions of the claims alleged, and that the arguments of Potter which are not even acknowledged by Sims are not being seriously pursued in the litigation. Thus, the issues of unpaid performance bonuses, the activity of Martha Harris, and other similar issues are not seriously treated in this opinion because they are not covered by the scope of the complaint.

Potter's argument for summary judgment of the retaliation claims is two-fold. First, Potter notes that Sims did not exhaust her administrative remedies with regard to either of her "retaliation claims." From the facts, it seems clear that the incidents were not reported to the EEO counselor within 45 days. It is up for debate whether or not this failure to exhaust would in fact foreclose Sims' retaliation claims.  Second, Potter argues that even if Sims did exhaust, or exhaustion was not necessary, she does not make out a *prima facie* case of retaliation for either alleged retaliatory action.

Sims did not, in fact, exhaust her administrative remedies with regard to either of the retaliation claims. Normally, this would be cause for judgment as a matter of law. However, in the retaliation context a plaintiff is not always required to exhaust his administrative remedies before bringing suit. *Gupta v. East Texas State University*, 654 F.2d 411 (5th Cir. 1981). If the retaliation claim grows out an earlier charge, in which there was exhaustion, the district court has jurisdiction to hear the retaliation claim arising out of it. *Id.* This rule makes sense in light of the inherent connection between many cases of retaliation and an earlier underlying charge of discrimination. The rule, however, is different when the supposed retaliation occurs before the EEO charge is filed. If the charge is filed after the retaliation occurs, then there is no reason that the

retaliation should not have to be included in the charge. *See, e.g.*, *Ward v. State of Florida*, 212 F.Supp. 2d 1349 (N.D. Fla. 2002). In the situation where the charge has not yet been filed, the plaintiff would not be required to double file, and including the retaliation in the charge would better apprise employers of the substance of the charges, so they can adequately investigate and tailor solutions to problems.

In this case, at least the first incident of "retaliation," Archbold's verbal harassment of Sims for the mediation, occurred before the July 27, 2001 letter to the EEO counselor. Despite Sims' claims to the contrary, the court finds no reference to the incident in the letter. For June 18, 2001, the letter references only:

> "[o]n Monday, June 18, 2001, after about an hour of work, I became physically ill again."

This in no way references any retaliation. She does not mention Archbold in the charge, nor does she mention any action of any kind that occurred at work on June 18. The primary incident of alleged retaliation occurred before she filed her formal charge, and she completely omitted it in her letter to the EEO counselor. The July 27 letter was very thorough, and outlined the events all the way back to 1997. She did not inform the EEO counselor, or likewise, her employer of this event. Therefore, Sims did not exhaust her administrative remedies. The question is whether she was required to do so. Judging by the relevant law, the June 18,

2001 retaliation claim should have been included in the final
letter to the EEOC of July 27, 2001, or filed within 45 days of
the June 18, 2001 incident. Judgment as a matter of law for
failure to exhaust is appropriate on this claim because Sims did
not exhaust. Regardless, Sims retaliatory harassment claim also
fails to create an issue of material fact on the merits, as
well.[6]

---

[6]Further, it is abundantly clear that Sims cannot succeed on the merits
with regard to this earlier retaliatory conduct claim. Sims claims that she
retaliated against following an informal employee mediation regarding her
claims of sexual harassment. Sims alleges that Archbold:

> "stood in the doorway of my office and mocked my complaints
> regarding his treatment of me and made light of the changes
> recommended at the informal mediation. Archbold's mocking and
> intimidation caused me to vomit at my desk and I was forced to
> work sick that day."

During her deposition she described the event similarly:

> "Ricardo's behavior was more like mocking what had happened,
> coming, good morning, are we feeling okay today, as if giving the
> indication that I'd gotten away with it again."

Sims left work that day and did not return until June 2002. Retaliation, under
Title VII, must include some "adverse employment action." In the Eleventh
Circuit, for the retaliation protections of Title VII to be successfully
invoked, the plaintiff must show that the retaliatory action "must either be
an ultimate employment decision or 'must meet some threshold level of
substantiality'" *Stravropolous v. Firestone*, 361 F.3d 612, 617 (11th Cir.
2004) *quoting Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d
1095, 1118 (11th Cir. 2001). A threshold level of substantiality requires the
action to be "objectively serious and tangible enough to alter [the
employee's] compensation, terms, conditions, or privileges of employment" or
adversely affect her status as an employee. *Gupta v. Florida Board of Regents*,
212 F.3d 571, 588 (11th Cir. 2000) (finding that a failure to get a preferred
teaching schedule was *not* an objectively serious employment action).

It seems impossible to say that Archbold's comments were
objectively "substantial", or that was it an ultimate employment action.
Archbold mocked Sims' claim, and the suggest changes. This hardly
"objectively" alters the terms and conditions of employment. Further, just
because Sims could not continue working does not make it "substantial" or an
"ultimate employment action." The focus is on what Archbold said or did, and
not on Sims' reaction to that action. Perhaps a pervasive continuing pattern
of such conduct would make an objectively substantial complaint which altered
the terms and conditions of employment. However, this is not that case. Based
on this one interaction between Archbold and Sims, it seems impossible to say

On the other hand, *Gupta* covers the denial of the higher pay scale occurring one year after the EEO charge as long as it was "reasonably related" to the charged conduct. *See, e.g.*, *Ward,* 212 F.Supp. 2d at 1357. Because Potter does not argue that the retaliation claim, occurring almost one year later, is not "reasonably related" to the original charge of sexual harassment, the court does not consider such an argument. Regardless, Sims' claim of retaliation for not keeping her same grade and pay upon her return fails for other reasons.

Turning to the merits of the "saved pay/grade" claim, Sims argues that when she returned to work after approximately one year of medical leave she did not receive the same pay grade and salary as she had before her leave. Sims believes that she was entitled to "salary protection" and "saved grade" that went into effect at the post office in the nineties.  However, there are a number of problems with this claim.

While Sims did make a retaliation claim in her complaint, the complaint does not include any claim for loss of pay/grade. The complaint alleges:

---

that this was an adverse employment action amounting to retaliation. Even including other previous actions taken by Archbold towards Sims, it seems none of them seem severe enough to correlate to an adverse employment action. Because these comments are not objectively serious or tangible enough to alter the terms and conditions of employment, this claim fails as a matter of law on the merits as well.

> "[p]laintiff has been retaliated against for opposing
> sexual harassment in the workplace. Sims complained of
> sexual harassment on several occasions and when
> Archbold found out about the plaintiff's complaints his
> harassment of her increased until she was forced to
> take medial leave for one year."

There is no claim resulting based on actions after her return to
the Postal Service. Further, Count II of the complaint **only**
references harassment by Archbold, all of which she claims
occurred prior to her leaving work in 2001. It is hard to imagine
how this complaint, other than its mere invocation of the word
"retaliation" covers a claim for failure to maintain pay and
grade after a one year absence.

Regardless of that, Sims' claim appears to be without any
merit. Sims suggests that she was retaliated against by the USPS
generally (not Archbold, this time) because the employer failed
to give her the same salary and grade when she returned to work
after a year of medical leave. A couple of points warrant noting
here. First, Sims voluntarily accepted the job as Retail Manager
despite its lower salary and pay grade. Second, there were no
jobs available at the time which were at, or above, her prior
salary and grade. Therefore, it is doubtful Sims can even prove
an adverse employment action, because she left the Postal Service
voluntarily. Sims has no right to maintain her prior salary after
one year of leave. However, there are even stronger grounds on
which this claim can be dealt with.

Sims cannot succeed on her claim of retaliation because the USPS does not routinely use Salary Protection. The USPS had a legitimate, non-retaliatory reason for not protecting the salary of Sims; that it does not use salary protection except in a case of reduction of force. The very testimony Sims cites for the proposition that such salary protection exists, also goes into greater detail about when it is actually available.  According to Pamela Bobulinski, Human Resources Specialist at the USPS, saved salary is only available where there is a reduction in force. In that circumstance, where someone's job is cut due to reduction in force, and they are forced to move down the ladder, their pay is saved until it gets back to its previous level. Bobulinski also added that the "saved grade" policy does not even exist anymore. Bobulinski's testimony, the only evidence on this issue, suggests that saved pay and grade would not be available to someone whose salary was reduced due to affirmatively leaving the Post Office, and not due to reduction in force.

No evidence has been presented which suggests pretext in this case. Sims does not argue any source of pretext, and a careful examination of the evidentiary material does not provide one. Potter's argument that "saved salary" is only available in cases of reduction of force is the only inference revealed by the evidence. Because Sims cannot show any evidence of pretext on the part of USPS, with regard to the saved salary program, summary

judgment on the retaliation claim for failure to save salary and grade is appropriate.

**Hostile Work Environment Sexual Harassment**

Potter, also, argues that he is entitled to summary judgment of on the hostile work environment sexual harassment claim. For a plaintiff to succeed against summary judgment on hostile work environment claim, he/she must provide evidence such that a reasonable jury could find that the workplace "permeated with discriminatory intimidation, ridicule and insult... sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993). To establish a *prima facie* case of hostile work environment a plaintiff must show that: (1) the plaintiff is a member of a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her gender; (4) the harassment was "sufficiently severe and pervasive to alter the terms and conditions of employment", creating an objectively hostile work environment; and (5) there is a basis for holding the employer liable. *See, e.g., Watson v. Blue Circle,* 324 F.3d 1252, 1257 (11th Cir . 2003).

Potter argues that Sims cannot establish a *prima facie* case because she fails to establish the 3rd and 4th elements of the *prima facie* case. Potter suggests that Sims cannot demonstrate that her harassment was because of her gender, nor that her

harassment was "sufficiently severe and pervasive" to constitute an objectively hostile environment that alters the terms and conditions of her employment.

**Harassment Because of Gender**

Potter argues that the alleged "harassment" was not based on Sims' gender, or any sexual issues, but on her poor working relationship with Archbold and her co-workers. Sims points to cases that hold that sexual harassment does not have to be "sexual" in nature, but rather can be harassment based on gender bias. *See, e.g., Bell v. Crackin Good Bakers, Inc*, 777 F.2d 1497, 1503 (11th Cir. 1985). In recent years, it has become clear that virtually any claim for "harassment" is cognizable so long as one can prove that the basis for the harassment was something protected by Title VII (or one of its companion statutes). *See, e.g., Oncale v. Sundowner Offshore Svcs.,* 523 U.S. 75 (1998). Thus, while Sims is not required to show evidence that there was a "sexual" component of the harassment, she must present evidence that shows some connection between her gender and the harassment. This nexus is critical to the finding that the harassment was "because of sex."

Sims goes through a litany of facts which arguably indicate that she was singled out for abuse by Archbold. However, with only one exception, Sims can, in no way, tie the harassing conduct to her gender. Potter claims that Archbold was simply fed

16

up with Sims and held her accountable, perhaps in a "harassing" way for the deficiencies of her department.

Sims evidence offered to prove that the alleged harassment was because of sex comes in two forms. First, Sims claims that Archbold made lewd, sexually suggestive gestures at her, and that he tried to get her to "party" on a company sponsored trip and come to his apartment to get concert tickets. Second, is Sims' assertion that she has never seen nor heard of a male taking abuse like she did. She does not, however, name or suggest any male "comparators" who performed similarly to her and were not subjected to Archbold's abuse. Likewise, she does not actually show that any other women were singled out for the "controlling" or "demeaning" treatment Archbold allegedly served up for her.[7] This evidence provides practically no inference that her abuse was "because of sex." Sims provides no evidence, other than the sexually suggestive gestures, that contradicts the idea that Archbold was merely "obnoxious" and was involved in a personal conflict with *her*, unrelated to her gender.

---

[7]For instance, in Sims brief, she charges that Archbold singled her out and demanded to see medical documentation for an illness that kept her out of work. Sims' alleges, with no citation, that Archbold had never required that of a male employee. However, it seems that Archbold never required any other employee to show medical documentation of illness other than Sims. When viewed that way does it really provide the inference that his "harassment" was "because of sex"? This court does not think so. A supervisor is perfectly free, under Title VII, to harass someone simply because they do not like them, or because they think they are incompetent, or because they think they are lying about an illness that kept them away from work. To simply note that Archbold had never undertaken such action before, and chose to do so with Archbold merely begs the question of whether it was because of her sex, it does not answer it.

Thus, the real issue is whether the sexually suggestive gestures, and/or the attempts to get Sims to "party" are enough evidence[8] to create a question of fact as to whether the harassment was "because of sex."[9] The sexual innuendoes, gestures, and overtures of Archbold, while limited in number and substantiality, taken in the light most favorable to Sims, arguably create an issue of fact as to whether Archbold's offensive conduct was because of Sims' sex. Because of those gestures, it is unclear whether or not Archbold would have made the same gestures or behaved similarly toward a male employee. Even those events which seem rather distinct from the *sexual* incidents cannot be definitively viewed as related only to work problems and in no way motivated by Sims' gender. If Sims' gender was important to his decision to make lewd gestures towards her,

---

[8]Potter argues fiercely that this evidence should not be seriously considered because Sims failed to mention some of the sexual overtures and gestures at any time before the filing of her affidavit along with her response to the motion for Summary Judgment. Neither in her letters to the EEO counselor, nor as a response to open ended questions at deposition did Sims tell Potter or the USPS about this alleged conduct. While this certainly casts severe doubt on this evidence, it does not rise to the level of contradiction of unambiguous deposition testimony. Therefore, the court must consider this evidence in the light most favorable to Sims, despite the weaknesses inherent in the evidence.

[9]For reasons that will become apparent in the next section of the opinion, this is irrelevant. However, for the sake of clarity, the types of alleged "harassment" endured by Sims seem so different in character as to be almost separable into those possibly motivated by his *sexual* feelings, and those motivated by his personal work related conflicts. Without donning the cap of an amateur psychologist, this court, however, feels it is ultimately unwise to assume that the motivation is not the same in both circumstances. Because the sexual gestures create a question of fact with regard to the motivation for some of the incidents, those same fact questions *must* permeate throughout the entire question of whether Archbold's actions were "because of sex."

the same motivation *could* have certainly been at the root of the alleged harassment. Genuine questions of motivation are absolutely the kind that are best left to a jury to decide.

**Severe and Pervasive**

Even if there is a question of fact regarding whether Archbold's actions were "because of sex", Sims cannot show that the alleged harassment was "sufficiently severe and pervasive to alter the terms and conditions of employment," creating an objectively hostile work environment. This fourth prong of the *prima facie* case requires that the alleged harassment be both "pervasive" and "objectively and subjectively severe." *Harris,* 510 U.S. at 21-22. Potter does not seriously contend that the alleged harassment was not "subjectively" abusive or hostile.[10] Therefore, the primary remaining questions are whether the alleged harassment was "objectively hostile and abusive."

A totality of the circumstances approach is used to determine whether conduct is objectively hostile or abusive. *Mendoza v. Borden*, 195 F.3d 1238 (11th Cir. 1999)(*en banc*). Title

---

[10]An interesting note, not argued by Potter, and  not seriously considered here, is that Sims failed to report the alleged sexual gestures to anyone when they happened, and did not report them to the EEO counselor, Virginia Files, in her letter. While she did ultimately reveal some of the details, she did not finally mention all of them until her own Declaration attached to her response to the motion for summary judgment. It seems that if plaintiff had found these events abusive and hostile, in light of all the other events she claims were abusive and hostile, she might have reported them to the EEO counselor. Events that are subjectively hostile tend to be of the sort that are easily recalled when writing a letter complaining of offensive behavior by a person, or when asked to talk about the offensive behavior of a person at a deposition.

VII is not a general civility code, and only protects against conduct that under the totality of the circumstances represents objectively hostile, or abusive, conduct. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Oncale*, 523 U.S. at 80.  Several factors inform the totality of the circumstances analysis, among them are: (1) the frequency of the conduct; (2) the severity of it; (3) whether the conduct was humiliating or physically threatening as opposed to offensive; (4) whether it unreasonably interfered with the employee's job performance. *See Harris*, 510 U.S. at 23; *see also Miller v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 2002). Taken generally, the factors must demonstrate that the conduct was severe enough to amount to a change in the "terms and conditions of employment. *See, e.g.*, *Faragher*, 524 U.S. at 788. In the instant case, Archbold's conduct does not amount to objectively hostile or abusive harassment.

Sims falls short of demonstrating harassment that is objectively hostile. Her claims of "harassment" are relatively infrequent, and spread out over a four year period. What she calls the "almost constant" barrage of sexual harassment was interrupted at least twice, once for eighteen months while Archbold was on assignment in another Post Office, and for four months when Sims was on a detail at Postal Headquarters in Washington, D.C.. Thus, over a four year period, there were at

least twenty two months where no harassment occurred. Some courts have held that a long break, such as this, allows the effects of a sexual harassment to dissipate, reducing the objective severity. *See, e.g.*, *Konstatopolous v. Westvaco Corp.,* 112 F.3d 710, 716 (3d. Cir. 1997)*, cert. denied*, 522 U.S. 1128 (1998). These extended breaks allowed for any severity to simmer down. All in all, it appears that about twelve incidents, of varying seriousness, took place over the four year period. Many of the incidents were months or years after the "sexual" incidents, with no direct correlation between them. Sims cannot claim that the alleged harassment occurred "frequently." Her most substantive allegation of harassment, that Archbold made sexually charged gestures, and two supposed sexual overtures, cannot described as frequent. Sims claims the gestures were made numerous times, but does not quantify it. However, from the evidence provided, it seems that there have been no sexual overtures, or sexual gestures **since 1999** when Archbold went on an 18 month assignment. Since that time, all of the claimed harassment relates one way or another to perceived problems on the job between here and Archbold.  Viewed in the totality of the circumstances, any sexual harassment here is not accurately described as constant or frequent.

The alleged harassment here was not particularly "severe" in light of relevant Eleventh Circuit law.  The vast majority of the

incidents making up the alleged harassment are events like Archbold's failure "to support Sims when she attempted to discipline John Carson," or that for two years in a row Sims was not allowed to complete the evaluations of her subordinates.[11] While events like these are somewhat bizarre, they do not represent severe mistreatment in the work place. These sorts of events are simply not "severe" as the term is used. Further, "numerous" similar gestures and the other two, rather tame, incidents claimed to be "sexual overtures" cannot carry the burden of proving severity alone. *See, e.g.*, *Mendoza*, 195 F.3d at 1246-249 (listing and summarizing many cases where more severe actions, including touching, fondling, and discussions of female body parts, failed to prove the severity component of a hostile work environment claim). Sims claims that on "numerous" occasions Archbold rolled his tongue in a manner suggestive of oral sex. What other interpretation could be placed on the "tongue rolling" is as speculative as Sims' interpretation. On another occasion, Archbold offered Sims concert tickets but told her that she must come to his apartment to get them. Finally, Sims claims that Archbold came to her hotel room on a company retreat and asked her to come out and "party." Viewed together, and even in light

---

[11]The lack of severity, and general weakness, of the claims that Sims was kept from performing evaluations of her subordinates is apparent. From the evidence, it seems obvious that Sims not allowed to fill out the evaluations because she was on detail on both occasions. The fact that the second time she did not evaluate her subordinates Martha Harris was the acting manager who kept her from performing evaluations, indicates that it was because of detail, and not sexual animus, that Sims did not evaluate her employees.

of the other incidents at work, these events are simply not
"severe" as that term has come be interpreted by the Eleventh
Circuit. *See id.*

The third element in determining the "objective" hostility
of harassment is whether the alleged harassment was humiliating
or physically threatening as opposed to merely offensive. Very
little of Archbold's conduct, as described by Sims, could be
characterized as physically threatening or humiliating. On June
8, 1998 Sims claims that while discussing the sub-par work of
Carson, Archbold "began making physically intimidating gestures
towards me, such as moving into my personal space and waving his
arms." While this has some component of physicality, it is not as
severe as an actual threat or violence or assault, or actual
physical touching, which Sims does not allege occurred. On other
occasions, Sims claims that Archbold chastised and humiliated her
in staff meetings, always for the sub-par work of Carson.[12] One
other occasion, Archbold asked Sims where she had been with other
employees looking on. The remainder of the claimed incidents of
harassment (even including the sexual gestures) constitute
neither physically threatening or humiliating conduct. While Sims
was offended by almost all of these interactions with Archbold,
her mere offense with being asked "to party," or taken off an

---

[12]No specific evidence is provided on this point beyond Sims' attached
declaration, which rather conclusory and without detail.

assignment at work without the knowledge of her co-workers, does not indicate that conduct was physically threatening nor especially humiliating. Even the events noted above which do carry a note of physicality or possible humiliation are not especially serious situations of either. Archbold did not touch Sims, he did not threaten her in any way, he did not make lewd remarks about her or gestures toward her in front of others. Without some conduct of this kind she cannot prevail on this point. Most of the alleged harassment is fairly characterized as the kind of "criticism," or "supervision" that most employees endure from their supervisors. While the criticism might have been misdirected, or unwarranted, it does not rise to the level of humiliating on merely that basis. Without more evidence that the conduct was somehow humiliating, or that further incidents were actually threatening to Sims, and not just offensive, she cannot succeed in proving this element. Thus, viewed in light of the surrounding circumstances, the alleged harassment of Sims by Archbold is not best characterized as physically threatening, or humiliating.

Finally, Sims does not show that the conduct affected her work performance. Negative effects on her work performance are an indication that the terms and conditions of her employment may have been altered. As noted by both parties, Sims apparently kept up a good work record, receiving good reviews, and high praise

from her superiors. However, as Sims notes, she did not receive at least two bonuses for performance. Further, the defense for the harassment given by Potter, that most of the "harassment" was merely criticism of her work or that of her department, also call into question whether, and to what extent,  Sims' work was affected. However, the failure to receive performance bonuses, and the criticisms, which Sims says was unwarranted, do not overwhelm an excellent record during the four year period which Sims claims she was harassed. According to Sims, most of the failures in her department were due to Carson, and Sims claims that Archbold knew that it was him who was at fault, not her.

The ultimate fact is that Sims work was not seriously affected. She received great reviews, and awards for special achievement up until the time she left USPS. This evidence is reflected in the Worker's Compensation findings. Sims does not contradict the evidence that her work continued to be satisfactory, even outstanding, throughout the time period of the harassment. All Sims musters in response is an argument that Potter cannot have it both ways. Sims claims that at some points Potter argues that Sims was a model employee, always succeeding, and at other points that all the criticism and controlling by Archbold was warranted. While there may be a problem reconciling these two positions, Sims does not seriously argue that her work was affected, maintaining that she was entitled to performance

25

bonuses, and that everyone recognized what a good job she was doing, even Archbold who she claims blamed her for things even he knew she was not responsible for.  Whatever motives were pushing Archbold to be critical of Sims, no evidence has been adduced that her work *actually* suffered. In fact, Sims' own Statement of Facts notes that "Sims possesses an exemplary work record and her performance has almost **always** been rated at or above expectations" (emphasis added). With parties agreeing that she was very successful and received commendations, the court finds that Sims' work performance did not suffer in any meaningful way due to the alleged harassment.

Looking at all the factors within the totality of the circumstances, the harassment alleged by Sims is not so objectively hostile as to the change the terms and conditions of her employment. Sims fails to show that any of the four parts of the totality of the circumstances test are met. Even those elements where some evidence was presented, it is overwhelmed by the long breaks and lack of severity of almost all the encounters between Sims and Archbold. All of these circumstances, taken together, still fall far short of many of the laundry list of cases where the Eleventh Circuit and other circuits, found an environment was not objectively hostile. *See Mendoza*, 195 F.3d at 1246-249 (noting that the objectively hostile work environment standard is often difficult for plaintiffs to overcome); *compare*

26

*Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995)(cited favorably by the Eleventh Circuit *en banc* in *Mendoza* "holding insufficiently severe or pervasive to support a hostile environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as 'tilly' and a 'pretty girl' and one instance of simulated masturbation"), *with Splunge v. Shoney's, Inc.*, 97 F.3d 488, 490 (11th Cir. 1996) (finding that harassers "grabbed plaintiffs, commented extensively on their physical attributes, showed them pornographic photos and videotapes, offered them money for sex, favored other employees who had affairs with them, speculated as to plaintiffs' sexual prowess, and so on" was enough to make a *prima facie* case of hostile work environment).   Therefore, because the harassment alleged by Sims is not frequent or abusive enough, she fails to prove that the conduct was severe and pervasive and fails to make a *prima facie* case of sexual harassment.

Sims concludes her argument on the "severe and pervasive" issue with an argument that the totality of the circumstances analysis should include a consideration of the fact that Sims claims that after she complained about Archbold's conduct no action was taken. This seems to the court as a misplaced argument about employer liability. While there may be questions of fact about whether or not Sims adequately reported the alleged

harassment and what if any reasonable actions were taken in response to the charges, those do not bear directly on the issue of the severity of the harassment. If, as this court has just held, the actions of Archbold were not severe and pervasive, USPS may have had no duty to do anything in response to the allegations. That, however, is a question of the employer's liability, and not of the objective hostility of the harassment by Archbold. Regardless, to the extent this argument might bear here, the failure to act by the USPS, when viewed in the totality of the circumstances, does not change a work environment which is not otherwise objectively hostile, into one which is objectively hostile. Even taking into account Sims' evidence of failure to act, the totality of the circumstances does not reveal an objectively hostile work environment.

Because the remaining questions of the vicarious liability of the employer may present questions of material fact, and because Sims fails to establish a *prima facie* case on other grounds, the liability question/defense was not seriously considered by the court.

### Conclusion

Taking the evidence in the light most favorable to Sims, she presents no issues of material fact, and summary judgment is

appropriate on both her retaliation claims, and on the claim for hostile work environment sexual harassment.

DONE this ___31st_ day of March, 2004.


_____

WILLIAM M. ACKER, JR.

UNITED STATES DISTRICT JUDGE